UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD J. PIEMONTE, | : | |
| SUZZANNE E. PIEMONTE, | : | Civ. No. 2:14-00124 (WJM) |
| MARIANNE A. WILLIS, and | : | |
| WILLIAM J. WILLIS, on behalf of | : | |
| themselves and others similarly situated | : | |
| | : | AMENDED COMPLAINT AND |
| Plaintiffs, | : | JURY DEMAND |
| v. | : | |
| | : | |
| VIKING RANGE, LLC, THE | : | |
| MIDDLEBY CORP., ABC | : | |
| CORPORATIONS 1-5, and JANE | : | |
| and/or JOHN DOES 1-5, | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiffs Ronald J. Piemonte and Suzanne E. Piemonte (hereinafter collectively referred to as "the Piemonte Plaintiffs") and Marianne A. Willis and William J. Willis (hereinafter collectively referred to as "the Willis Plaintiffs") (hereinafter collectively referred to as the "Plaintiffs"), on behalf of themselves and others similarly situated, by way of Complaint against Defendants, state as follows:

## **PARTIES**

1.  Plaintiff Suzanne Piemonte resides at 11 Fox Run Road, Township of Sparta, County of Sussex, State of New Jersey.

2.  Plaintiff Ronald Piemonte resides at 11 Fox Run Road, Township of Sparta, County of Sussex, State of New Jersey.  At all times relevant, Plaintiff Ronald Piemonte has been the husband of Plaintiff Suzanne Piemonte.

3.   Plaintiff Marianne A. Willis resides at 15 Fox Run Road, Township of Sparta, County of Sussex, State of New Jersey.

4.   Plaintiff William J. Willis resides at 15 Fox Run Road, Township of Sparta, County of Sussex, State of New Jersey.  At all times relevant, Plaintiff William J. Willis has been the husband of Plaintiff Marianna A. Willis.

5.   All similarly situated Plaintiffs in the class have purchased a Viking refrigerator during the recall years bearing one of the following model nos.:

 a.   VCBB363;

 b.   VCBB536;

 c.   VIBB363;

 d.   VIBB536;

 e.   VCBB5361;

 f.   DDBB363;

 g.   DDBB536;

 h.   DTBB363;

 i.   DFBB363;

 j.   DFBB536; or

 k.   FDBB5361.

6.   Defendant Viking Range, LLC, a Mississippi corporation whose principal place of business is located at 111 Front Street, Greenwood, MS ("Viking"), manufactures and markets professional and commercial-type kitchen appliances for the home.

7.   Defendant The Middleby Corp, an Illinois corporation whose principal place of business is located at 1400 Toastmaster Drive, Elgin, IL 60120 ("Middleby"), acquired Defendant Viking in or about December 2012.

8.   Defendant Middleby is a leading producer of commercial cooking and food processing and packaging equipment for the food service industry.

9.   ABC Corporations 1-5 are fictitious entities that owed a duty to the Plaintiffs and who breached that duty in causing Plaintiffs injury and damage generally set forth in this Complaint. Plaintiffs are currently unaware of the identity and potential liability of ABC Corporations 1-5.

10. Jane and/or John Does 1-5 are fictitious individual parties who owed a duty to the Plaintiffs and who breached that duty in causing Plaintiffs injury and damage generally set forth in this Complaint.  Plaintiffs are currently unaware of the identity and potential liability of Jane and/or John Does 1-5.

## INTRODUCTION AND CERTAIN DEFINITIONS

11. This is an action for violations of the New Jersey Consumer Fraud Act. N.J.S.A. §56:8-2, et seq. and the New Jersey Products Liability Act, N.J.S.A. §2A:58C, et seq. by and on behalf of a class of former, current and future purchasers who reside in New Jersey of certain of Defendant Viking's refrigerators.  Because of Defendants' decisions, policies, plans, acts and/or omissions, these Plaintiffs and others similarly situated were, continue to be and will be injured and/or incur damages as a result of defective door hinges on certain Defendant Viking refrigerators.

12. In this pleading, the "Class" is limited to those former, current and future purchasers of certain Defendant Viking refrigerators who reside in the State of New Jersey and who have been, are, or in the future will be injured and/or incur damages as result of Defendant Viking refrigerators' defective door hinges.

## VENUE

13. Pursuant to 28 USC §1441, venue is proper in the District Court of New Jersey arising from diversity of citizenship.

## FACTUAL BACKGROUND

### I. "The Viking Experience"

14. From its inception, Defendant Viking sought to build a brand rather than merely sell appliances.

15. The Defendant Viking brand needed to stand for something larger than just another appliance manufacturer – more than just a stamper of stainless steel.

16. The Defendant Viking brand needed to be brought to life so that consumers would experience the Defendant Viking way of life rather than just purchase a high-powered range, for example.

17. Defendant Viking wanted to sell the "Viking Experience."

18. As a result, Defendant Viking became known as one among an elite group of companies providing luxury goods, evolving into exclusivity of experience and lifestyle.

19. By 2006, Fortune Magazine ranked "Viking" among the most sought after brands in the United States.

20. In an August 30, 2007 Time Magazine article:

   a. Defendant Viking Range Marketing Director, Bill Andrews, in response to Viking turning twenty (20) years old that year, stated "It just seems like we have been around forever because Viking is an icon."

   b. Founder and CEO Fred Carl stated he "set out to create a brand that would

4

become synonymous with professional-class home cooking.  He picked a look (industrial), a niche (upscale), and a mission (to be on the cutting edge of the food movement), and has not deviated."

    c.   Kathy Potts, who headed the Defendant Viking Life Division, stated that "Viking consumers are passionate about their purchase and want opportunities to engage in the lifestyle."

21. In a video uploaded on YouTube on or about February 16, 2009, a beautiful, upscale kitchen was shown with the tag line "Imagine your life in a Viking kitchen."

22. In a March 2009 study published by the consulting firm Tom Julian and the Brand Asset Consulting division of Y&R, Defendant Viking was one of a small handful of brands that was recognized for increasing brand strength during the recession.  "The well-heeled are seeking a sense of connection between the world in which they live and the premium brands they consume, marking a departure from the longtime sensibility of detachment and superiority to which many luxury brands have played."

23. In an in-depth study conducted in 2010 entitled "The New Face of Affluence," Dwell Strategy and Research noted that "Viking's experience-based brand strategy was once again recognized for being among a very select number of luxury brands that remained relevant to consumers during the recession.  These wealthy and would-be elites are actually looking for brand interaction – a dialogue – based on integrity, authenticity, and performance.  And not only are they equipped for interaction, they are demanding it."  The study concluded that successful companies like Defendant Viking have learned "Don't sell them [the New Affluents] a product.  Offer them a brand.  Better yet, a brand experience – just like astute marketers have been doing for years."

24. Even Dana Cowin, Food & Wine's Editor-in-Chief remarked that "Viking is no longer a badge for consumers.  Viking is a part of their identity."

25. In a publication entitled "Viking History & Milestones," Defendant Viking states, in pertinent part, that:

      a.  It is "the originator of commercial-type cooking equipment for the home, Viking Range Corporation is the only company in the industry to offer two distinctive, complete lines of ultra-premium appliances, as well as cookware, cutlery, and small electric appliances, designed for those who enjoy the finer things in life."

      b.  "The Viking Professional Series, considered the foremost name in the ultra premium appliance market, offers the only complete line of professional-style appliances available for luxury kitchens, both indoor and outdoor."

26. To foster the public's perception of excellence and desirability among the elite, Defendant Viking states on its website that "Quality is Our Passion" and

> Viking Range, LLC is committed to being a best-in-class organization with quality people nurturing a zero-defect philosophy.  We will be the benchmark for others by producing the best premium home appliances and providing the best service possible.  We are committed to continuous improvement and innovative product technology and design to ensure this goal is reached and maintained.

27. This carefully crafted persona manipulated the public into believing that the "Viking Experience" justified the higher cost due to its superior quality and performance.

28. Under Defendant Viking's website section entitled "History, Milestones, and Awards, Defendant Viking references the design awards won for its refrigerator, but no mention is made of its performance:

- 2000 – Design Journal's ADEX award (Gold) – 36' Designer Bottom Mount

6

Refrigerator;

- 2001 – Gold Awards for Designer Series built-in TimePiece "electric oven and Designer Series bottom-mount refrigerator;

- 2009 – Chicago Athenaeum and The European Centre for Architecture, Art, Design, and Urban Studies GOOD Design award for Professional Custom Series…Designer Series kitchen appliance line;

- 2009 – GOOD Design Award presented by the Chicago Athenaeum Museum of Architecture and Design Viking Designer Kitchen Appliance;

## II.    Refrigerator Recalls  - The Real "Viking Experience"

29. While Defendant Viking was receiving the accolades and carefully managing the public perception of excellence, it was also concealing the defective door hinges on several of its Professional Series Refrigerators.

30. As early as 2001, Defendant Viking learned that certain of its refrigerators sold between July 1999 and April 2006 had a defective door hinge which was reported to loosen, thereby allowing the refrigerator door to sag and eventually separate from the unit.

31. Viking received its first complaints involving hinge failures in January of 2001 and by April of 2008 had received 8 injury complaints due to the hinge failures.

32. Ultimately, Defendant Viking had received approximately fifty-seven (57) reports of doors detaching, including four (4) reports of injuries involving bruises, broken toes/fingers, and strains.  Also several incidents of minor damage to floors and counters were reported prior to reporting any issues with the refrigerator door hinges.

33. Despite this knowledge, Defendant Viking continued to sell the refrigerators and at no time advised the purchasing public of the potential hazard.

34. In or around April 2009, Defendant Viking could no longer withhold this information and finally reported to the U.S. Consumer Safety Product Commission ("CSPC") a manufacturing defect in a door hinge support mechanism on certain models of Defendant Viking built-in 48 inch wide side-by-side refrigerator/freezers and built-in 36 inch wide refrigerators with bottom freezers manufactured between July 1999 and April 2006.

35. On or about June 16, 2009, the CSPC announced a recall of over forty-five thousand (45,000) Viking Built-In Side-by-Side Refrigerator/Freezers and Refrigerators with Bottom Freezers sold at various retail outlets and specialty stores from July 1999 to April 2006.

36. On or about July 5, 2011, Defendant Viking agreed to pay a Four Hundred Fifty Thousand Dollars ($450,000) civil penalty based on the CSPC claim that Defendant Viking was aware of the manufacturing defect for several years before reporting it to the CSPC.

37. By law, Defendant Viking should have reported the defect to the CSPC within twenty-four (24) hours of learning of the defect, but failed to do so.

38. Defendant Viking had sufficient information to conclude that the refrigerators contained a defect which could create a substantial product hazard or an unreasonable risk of serious injury or death.

39. Even after paying the civil penalty, consumers reported unreasonable delays in repairing the defective refrigerators, often coming after months of waiting and many telephone calls to Defendant Viking's Customer Service Department.

40. In many instances, the repairs failed to correct the problem.

41. On or about July 25, 2013, the CSPC announced a nationwide recall of approximately thirty-one thousand (31,000) more Defendant Viking built-in refrigerators with bottom freezers

8

sold at retail appliance and specialty stores nationwide from November 1, 2005 through August 10, 2012.

42. These refrigerators posed an injury hazard to consumers due to the weld securing the pin to the pivot plate on the door breaking, causing the door to detach from the refrigerator and creating a risk of impact injury or fall.

43. Since its initial recall, Viking had received an additional thirty-nine (39) reports of falling refrigerator doors, including twelve (12) reports of injuries involving a fracture, bruises, strains, and cuts, and twenty-five (25) reports of minor property damage.

44. The CSPC announced the recall and urged consumers to stop using certain Defendant Viking refrigerators if there was any indication that the doors were not sealed properly.

### III.    Piemonte Plaintiffs

45. In or about June 2002, the Piemonte Plaintiffs purchased a Defendant Viking refrigerator (the "Refrigerator") with a bottom freezer, model DFBB363, serial number F04190203897 from their local distributor, Oberg & Lindquist ("Oberg") in Westwood, New Jersey.

46. The Piemonte Plaintiffs were told by the Oberg representative that Defendant Viking was a premier refrigerator company, one which was comparable to the Sub-Zero brand.

47. The Piemonte Plaintiffs were familiar with Defendant Viking's reputation with ovens and ranges, so they believed that the refrigerator would be of similar high quality.

48. They were not aware of any design defects since the specifications regarding their refrigerator contained no warnings nor were any cautionary messages provided to them by the person who sold them the product.

49. The Defendant Viking refrigerator was installed by Oberg in or about July/August 2002.

50. In or about March 2011, the Piemonte Plaintiffs noticed that the refrigerator door was not working properly.

51. They called Defendant Viking's toll free number to obtain information on who in their area was authorized to repair Defendant Viking refrigerators.

52. The Piemonte Plaintiffs were directed to United Refrigeration ("United"), which made the necessary repairs, including rebuilding the motor.

53. United inquired if the refrigerator had been repaired per Defendant Viking's 2009 recall.

54. The Piemonte Plaintiffs said they had not been notified of the recall.

55. United advised them to immediately register the refrigerator with Defendant Viking, if they had not already done so, and to contact Morris County Appliance Repair ("MCAR") which would be able to perform the repairs necessitated by the recall.

56. In or about March 2011, United registered the refrigerator on behalf of the Piemonte Plaintiffs.

57. In or about March 2011, the Piemonte Plaintiffs contacted MCAR, which repaired the refrigerator in compliance with the 2009 recall.

58. On or about the morning of Sunday, July 7, 2013, Plaintiff Suzzanne Piemonte opened the refrigerator door.  She heard a cracking noise and immediately saw the refrigerator door falling toward her.

59. She placed her arms across her face to protect herself against the weight of the refrigerator door, which had completely come off the door hinge.

60. The refrigerator door landed against her body, forcing her head to jerk backwards, hitting the granite countertop, which was positioned immediately across from the refrigerator.

61. Plaintiff Suzzanne Piemonte was knocked to the kitchen floor with the refrigerator door landing directly on top of her.

62. She began screaming for her husband, Plaintiff Ronald Piemonte, who rushed to her aid. He found her lying on the floor with the refrigerator door on top of her.

63. Plaintiff Suzzanne Piemonte was surrounded by broken glass and those food items that had been stored on the refrigerator door which hit the floor when the door became unhinged. Water was spurting all over the kitchen from the area where the door had become unhinged.

64. Due to the weight of the refrigerator door, Plaintiff Ronald Piemonte was only able to push the door off of his wife rather than lifting it off of her.

65. Plaintiff Ronald Piemonte helped his wife from the kitchen floor to a chair for her to compose herself.

66. She did not believe any bones had broken so she was not immediately taken to the hospital.

67. Plaintiff Ronald Piemonte called United and left a message of urgency.

68. At or around 6 a.m. on Monday, July 8, 2013, Plaintiff Suzzanne Piemonte awoke to a throbbing painful headache, ringing in her right ear, numb and cold feet, bruises on her arms and legs, excruciating pain in her right lower back, and black and blue marks on her nose and underneath her eyes from where her arms had hit her face holding back the refrigerator door.

69. Plaintiff Ronald Piemonte immediately brought Plaintiff Suzzanne Piemonte to the Morristown Memorial Hospital's Emergency Room (the "Hospital").

70. Plaintiff Suzzanne Piemonte was advised that she had no broken bones but that her pre-existing medical conditions had all been severely exacerbated by the falling refrigerator door.

71. Upon returning home from the Hospital, Plaintiff Ronald Piemonte received a message from United to contact MCAR.

72. Upon arriving at the Piemonte Plaintiffs' home on or about July 8, 2013, MCAR confirmed that the screw attaching the pivot plate of the top hinge on the door was sheared resulting in the door detaching from the unit, causing the door to fall on Plaintiff Suzzanne Piemonte.

73. On or about Monday, July 8, 2013, Plaintiff Ronald Piemonte contacted Defendant Viking's customer service department to report the accident.

74. Still believing in the "Viking Experience", the Piemonte Plaintiffs agreed to have a new Defendant Viking refrigerator installed at their home.

75. On or about July 15, 2013, a new Defendant Viking refrigerator was installed by Carl Schaedel & Co., Inc. ("Carl Schaedel"), a local Defendant Viking distributor.

76. The replacement refrigerator was an updated version of the original Defendant Viking refrigerator but with a slightly lighter door and a different hinge system.

77. On or about July 19, 2013, four (4) days after installation, the duct heater in the freezer malfunctioned causing the freezer to frost up.

78. Carl Schaedel replaced the duct heaters and installed new data loggers to track the temperature.

79. On or about December 15, 2014, the freezer in the replacement refrigerator frosted up again.

80. On or about December 24, 2014, the AGS Appliance Service ("AGS") found a bad low voltage board, which was replaced along with a defrost thermometer.

12

81. Had the Piemonte Plaintiffs been fully apprised as to the inferior quality and performance of the Defendant Viking refrigerator, they never would have purchased the original Defendant Viking refrigerator in 2002.

**IV.    Willis Plaintiffs**

82. In or about the spring 2003, the Willis Plaintiffs purchased from Littell's Appliance in Sparta, New Jersey, a Defendant Viking refrigerator with a bottom freezer, serial number VCBB363.

83. They were advised by the sales representative that Defendant Viking made top of the line refrigerators and were well worth the exorbitantly expensive price.

84. The Willis Plaintiffs were not aware of any design defects which might cause personal injury or property damage.

85. The specifications did not contain any cautionary notices nor were they advised of any possible defects by the store where the refrigerator was purchased.

86. In or about June 2009, the Willis Plaintiffs were notified of a recall requiring replacing the door hinges on the refrigerator, which had been previously repaired.

87. In or about August 2013, having not received any notice of a second recall, the Willis Plaintiffs contacted Defendant Viking's Customer Service Department to inquire if their refrigerator needed to be repaired or replaced.

88. The Willis Plaintiffs left numerous messages with Defendant Viking's Customer Service Department, but never received a return telephone call.

89. Since that time, the gasket on the refrigerator door has not been holding properly, food is not staying cold, and the alarm goes off at least once every night, alerting the Willis Plaintiffs that the door is not properly closed.

90. The refrigerator door is hanging at an ever-increasing precarious angle leaving the Willis Plaintiffs anxious that it will fall off the hinge causing both personal injury and property damage.

91. The Defendant Viking refrigerator has been constantly leaking water out of the bottom and the freezer door is shut tight, despite defrosting the freezer thinking that would resolve the problem.

92. After well more than one (1) year of requesting a replacement refrigerator, on or about January 14, 2015, Defendant Viking finally agreed.

93. The Willis Plaintiffs no longer trust Defendant Viking products and have refused to have a replacement refrigerator installed in their home.  They will be purchasing another brand.

**V.     Class Plaintiffs**

94. The Plaintiffs' claims are typical of the claims of the members of the Class.

95. In fact, Plaintiffs' claims reflect precisely the range of claims which could be presented by Class members, ie. where no doors have fallen off the hinges to the opposite extreme where the door has fallen and both personal injury and property damage have resulted.

96. The proposed class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.  The precise number of such persons is unknown and the facts on which the calculation of that number are presently within the sole control of Defendants.  Upon information and belief, approximately one thousand eight hundred (1800) recalled refrigerators were either purchased by or being used by New Jersey residents.

97. The Plaintiffs' claims and the claims of the Class, present questions of law and fact that are common to all Class members, ie. the possession of a recalled refrigerator.

98.    The Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions.  All the Class members were subject to the same dangerous product as alleged herein.  Defendants' negligent, careless, and/or reckless actions affected all Class members similarly, and Defendants benefitted from the same type of practices and/or wrongful act as to each Class member.

99. The Plaintiffs and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices, and procedures.

100.  The Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class.

101.  The Plaintiffs are represented by attorneys who are experienced and competent in class action litigation.

102.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

103.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

104.  Because the losses, injuries, and damages suffered by each individual class member are modest compared to the expenses and burden of individual litigation, non-certification of the Class would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.

105.   The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the Class as a class action would result in a significant saving of these costs.

106.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the dispositions of their interests through actions to which they are not parties.

107.   The issues in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

108.   There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a.   Whether, beginning as early as 2001 and continuing to 2009, Defendants deliberately concealed from the Plaintiffs and the Class the fact that an existing defect would cause the refrigerator door to become unhinged causing personal injury and property damage.

b.   Whether, following the 2009 recall, Defendants deliberately concealed from the Plaintiffs and the Class that the defect was not remediated causing refrigerator doors to become unhinged causing personal injury and property damage.

c.   Whether Defendants have taken all actions necessary and appropriate to insure that the defective door hinge has been remediated in order to avoid future personal injury and property damage resulting from the refrigerator door becoming unhinged from the unit.

    d.   Whether Defendants have taken all actions necessary and appropriate to notify Plaintiffs and the Class that the refrigerator doors were defective and could cause personal injury and property damage beginning in 2001 and continuing to the present.

109.  The Class claims set forth herein are maintainable under R. 4:32-1(b)(1), (2) and (3).

## COUNT I
### (Violation of New Jersey Consumer Fraud Act)

110.  Plaintiffs repeat and reallege paragraphs 1 through 109 as if set forth at length herein.

111.  At all relevant times, Defendants have been and continue to manufacture, market, sell, and/or repair professional and commercial-type kitchen appliances for the home.

112.  As set forth above, Plaintiffs have been, during all times relevant to this cause of action "consumers" within the meaning of the New Jersey Consumer Fraud Act ("CFA").

113.  The refrigerators are "goods" within the meaning of the CFA.

114.  At all relevant times material hereto, Defendants conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

115.  Defendants jointly and/or severally, committed an unconscionable commercial practice, in violation of the CFA, through deception, fraud, false pretense, false promise, misrepresentation and/or the knowing concealment, suppression or omission of any material fact in connection with the sale and advertisement of the merchandise relating to the recalled refrigerators.

116. As set forth above, Defendant Viking wanted to sell the "Viking Experience" and as a result, Defendant Viking became known as one among an elite group of companies providing luxury goods, evolving into exclusivity of experience and lifestyle.

117.  This carefully crafted persona manipulated the Plaintiffs and Class Plaintiffs into believing that the advertised "Viking Experience" justified the higher cost due to its superior quality and performance.

118.  Defendants caused Plaintiffs and Class members "ascertainable loss" by virtue of their violations of the CFA.

119.  Plaintiffs' claims are typical of the claims of the members of the Class.

120.  All the Class members were subject to the same unconscionable commercial practices as alleged herein.  Defendants' policies and practices affected all Class members similarly, and Defendants benefitted from the same type of unconscionable commercial practices and/or wrongful act as to each Class member.  Plaintiffs and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices, and procedures.

121.  As a direct and proximate result of Defendants' unlawful conduct, as set forth herein, Plaintiffs and the Class members have sustained damages to their personal and real property.

122.  The Defendants' violation of the regulations promulgated under the New Jersey Consumer Fraud Act render them strictly liable to the plaintiffs.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others in the Class, pray for relief as follows:

a.  An order certifying this case as a class action and appointing Plaintiffs to represent the Class and Plaintiffs' counsel as Class counsel;

b.  Restitution and disgorgement of all amounts obtained by Defendants as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

c.  All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

d. Actual and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law, including mandatory treble damages pursuant to the CFA;

e. An order (1) requiring Defendants to immediately cease its wrongful conduct as set forth above; (2) enjoining Defendants from continuing to conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; and (3) requiring Defendants to refund to Plaintiffs and all members of the Class the funds necessary to repair or replace the refrigerators as appropriate;

f. Statutory pre-judgment and post-judgment interest on the Class damages;

g. Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

h. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## COUNT II
**(Strict Products Liability N.J.S.A. 2A-58C, et. seq.)**

123.  The Plaintiffs repeat and reallege paragraphs 1 through 122 as if set forth at length herein.

124.  Defendant Viking, at all times relevant to this Complaint, is in the business of designing, manufacturing, marketing, and selling Defendant Viking refrigerator model nos. VCBB363, VCBB536, VIBB363, VIBB536, VCBB5361, DDBB363, DDBB536, DTBB363, DFBB363, DFBB536, and FDBB5361, for use by members of the general public.

125.  At all times relevant to this Complaint, the refrigerators and its component parts were defective as to the design and manufacture, in that the bolts and hinges used to hold the

19

refrigerator doors on the unit itself were defective and would sheer off causing the large heavy doors to fall off.

126.  At all times relevant to this Complaint, the refrigerators and their component parts were defective as to design and manufacture at the time they left Defendant Viking's manufacturing facility.

127.  Defendant Viking's refrigerators were unsafe for their intended use as they caused an unreasonably dangerous condition.

128.  As a direct and proximate result of the defective condition of the refrigerators and their component parts, the Plaintiffs suffered and continue to suffer personal injury and/or injury to property.

129.  Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others in the Class, pray for relief as follows:

a.  An order certifying this case as a class action and appointing Plaintiffs to represent the Class and Plaintiffs' counsel as Class counsel;

b.  Restitution and disgorgement of all amounts obtained by Defendants as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

c.  All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

d.  Actual and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law;

e.  An order (1) requiring Defendants to immediately cease its wrongful conduct as set forth above; (2) enjoining Defendants from continuing to conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; and (3) requiring Defendants to refund to Plaintiffs and all members of the Class the funds necessary to repair or replace the refrigerators as appropriate;

f.  Statutory pre-judgment and post-judgment interest on the Class damages;

g.  Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

h.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## DESIGNATION OF TRIAL ATTORNEY

Kevin Barber, Esq. is hereby designated as trial counsel in the within matter.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial of all issues so triable in this case.

Respectfully submitted,
**NIEDWESKE BARBER HAGER, LLC**

Dated: <u>March 9, 2015</u>                By: <u> /s/ Kevin E. Barber</u>
                                        Kevin E. Barber
                                        Counsel for Plaintiffs &
                                        Proposed Class Members
                                        NIEDWESKE BARBER HAGER, LLC
                                        98 Washington Street
                                        Morristown, New Jersey 07960
                                        Phone: (973) 401-0064
                                        Fax:    (973) 401-0061
                                        www.n-blaw.com

21